UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ADDIE FISHER,<br><br>        Plaintiff,<br><br>        v.<br><br>HARVARD PILGRIM HEALTH CARE<br>OF NEW ENGLAND, INC.,<br><br>        Defendant. | Civil Action No.<br>17-11232-FDS |

## MEMORANDUM AND ORDER ON
## THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

Plaintiff Addie Fisher contends that defendant Harvard Pilgrim Health Care of New England, Inc. ("HPHC") failed to pay her medical benefits that she was owed under her health plan. Specifically, she challenges HPHC's decision to stop paying for residential treatment for her eating disorder on the ground that it was not medically necessary.

The parties have filed cross-motions for summary judgment.[1] For the following reasons, HPHC's motion will be granted and Fisher's motion will be denied.

---

[1] Fisher titles her motion a "motion for judgment." The Court will consider it as a motion for summary judgment.

## I. Background

### A. Factual Background

The following facts are undisputed unless noted otherwise.

#### 1. The Plan

At the times relevant to this case, Addie Fisher was a covered beneficiary under an employer-provided HMO health-care plan issued by HPHC. (Def. SMF ¶ 1). HPHC contracted with United Behavioral Health ("UBH") to make initial coverage determinations for its beneficiaries. (*Id.* ¶ 2; Partial Record for Judicial Review 0052). UBH operated under the brand Optum. (Record 0126).

Fisher's plan covered only medical services that were deemed to be "Medically Necessary." (Record 0023). The plan defined "Medically Necessary" services as follows:

> [t]hose medical services which are provided to a Member for the purpose of preventing, stabilizing, diagnosing or treating an illness, injury or disease, or the symptoms thereof, in a manner that is (a) consistent with generally accepted standards of medical practice, (b) clinically appropriate in terms of type, frequency, extent, location of service and duration, (c) demonstrated through scientific evidence to be effective in improving health outcomes, (d) representative of best practices in the medical profession, and (e) not primarily for the convenience of the enrollee or physician or other health care provider.

(Record 0020).

The plan provided that HPHC (and UBH) would "use clinical review criteria" to "evaluate whether certain services or procedures [were] Medically Necessary." (Record 0017).

In 2015, UBH issued a "Level of Care Guidelines" that listed "Common Criteria and Clinical Best Practices for All Levels of Care." (Record 0319). The first section provided nine "Admission Criteria," two of which, criteria 1.4 and 1.8, are particularly relevant. Criterion 1.4 provided:

> 1.4   The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to

2

> acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission).
>
> 1.4.1 Failure of treatment in a less intensive level of care is <u>not</u> a prerequisite for authorizing coverage.

(Record 0319). Criterion 1.8 provided:

> 1.8 There is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time.
>
> 1.8.1. Improvement of member's condition is indicated by the reduction or control of the acute signs and symptoms that necessitated treatment in a level of care.
>
> 1.8.2. Improvement in this context is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement must also be understood within the broader framework of the member's recovery, resiliency and wellbeing.

(Record 0320).

### 2. **Fisher's Treatment**

Fisher first received treatment for bulimia nervosa in December 2014. On December 2, 2014, she was admitted to Walden Behavioral Care, a private psychiatric hospital in Waltham, Massachusetts. (Def. SMF ¶ 7). On December 29, she started Walden's "partial hospitalization program." (*Id.*). On January 14, 2015, after being discharged from the partial hospitalization program, she was approved for an intensive outpatient program, but never actually received any outpatient treatment. (*Id.*).

On May 26, 2015, Fisher's mother called UBH and sought permission for her to attend the Oliver Pyatt Center, an eating-disorder treatment center in Miami, Florida. (*Id.* ¶ 8). Later that day, Fisher was admitted to a hospital in New Hampshire after she expressed suicidal thoughts. (*Id.*). She was discharged from the New Hampshire hospital on May 28 and soon

3

thereafter began receiving treatment at the Oliver Pyatt Center in Florida. (*Id.*). Although Oliver Pyatt was out of UBH's network, Fisher and UBH reached a "single case agreement" to cover her residential treatment, as there were no eating-disorder treatment centers "in geo-access" of Fisher's home in New Hampshire. (*Id.* ¶ 8-9, Record 0098).

Fisher's residential treatment at Oliver Pyatt ended on July 31, 2015. (*Id.* ¶ 11). It appears that she began receiving treatment through Oliver Pyatt's partial hospitalization program on August 1. (Record 0126). On August 3, an Oliver Pyatt representative called a UBH "Care Advocate" named Stefanie Adzema and requested that UBH approve coverage for Fisher's treatment in its partial hospitalization program. (*Id.* ¶ 13). Adzema conducted a "Facility Based Review" and concluded that Fisher did not appear to "meet [the] medical necessity guidelines" for a partial hospitalization program. (Record 0174). Accordingly, she referred Fisher's case to a UBH Associate Medical Director, Dr. Melinda Privette, for a "peer-to-peer review." (*Id.*).

On August 4, 2015, Dr. Privette conducted a "very difficult" peer-to-peer review that included a morning telephone interview with Fisher's treating physician, psychologist, and social worker at Oliver Pyatt. (Def. SMF ¶ 16, Record 0176). According to Dr. Privette's notes of the call, the Oliver Pyatt representatives "stated that [Fisher] needed to stay" in the partial hospitalization program because (1) she had "just reached the point of stability" and still needed to "work on self-plating meals and going on more passes;" (2) she needed "more individual therapy to work on her anxiety about eating" and "want[ed] to connect with her birth parents;" and (3) neither Fisher nor her parents would be able to drive her to an outpatient program. (Record 0179).[2]

---

[2] The Oliver Pyatt representatives told Dr. Privette that Fisher had "never had the opportunity to self plate and manage her own food," but Dr. Privette believed this to be "simply not true," as she had self-plated and managed her own food earlier that year at Walden.

4

Dr. Privette disagreed with that assessment. In her note of the review, apparently submitted at 12:40 p.m. on August 4, she concluded that Fisher could be safely and effectively treated with intensive outpatient treatment and thus that the requested partial hospitalization program at Oliver Pyatt did "not meet" the "level of care guideline required to be followed" under the plan. (Record 0099).[3]

That same day, Dr. Privette sent Fisher a letter informing her that "the request by [Oliver Pyatt] for authorization for Mental Health Partial Hospitalization Treatment beginning on 08/01/2015 has been denied by Optum." (Record 0126). The letter continued:

> Under the terms of our agreement with Harvard Pilgrim, services must be medically necessary and otherwise covered under the plan. It is Optum's determination that services requested are not covered under the plan because:
>
> . . . Dr. Privette had the following findings:
>
> "A request was made for certification for the Mental Health Partial Hospitalization Treatment Services for 08/01/2015 and forward. The clinical information was reviewed, including a live review with doctor, as well as the applicable medical necessity guidelines. Based upon the review, effective 08/01/2015 and forward, it is my determination that medically necessity requirements for your behavioral health plan's Partial Hospitalization: Mental Health Level of Care Guidelines are not met. Care could continue with Mental Health Outpatient Treatment Services.
>
> You were admitted not eating a safe and healthy diet. After talking with your doctor and your treatment team, you have made good progress and do not need the type of care provided in a full day partial hospitalization setting. You can continue your care with the extended, comprehensive outpatient team we have put together for you, including being able to see a therapist up to three times a week."

---

[3] Specifically, Dr. Privette noted that Fisher's weight was stable; that she was actively engaged in her treatment; that she was compliant with her meal plan; that she had not been engaging in any binging or purging behavior; that she was tolerating medication without difficulty; and that she had no suicidal or homicidal ideation or psychotic symptoms, although she had reported some anxiety. Dr. Privette also noted that her family was involved in her treatment and that UBH had "put together the equivalent of an [intensive outpatient program]" in her "home area," through which she could see a primary-care physician, psychiatrist, dietician, and therapist. Finally, Dr. Privette noted that the third reason Oliver Pyatt believed their partial hospitalization program was needed– that Fisher's "parents" could "not provide transportation" – was a "convenience issue" only and thus "not an appropriate reason to authorize [a partial hospitalization program]." (Record 0099-0100).

(Record 0126). The letter then continued:

> This determination is based on the Optum Level of Care Guidelines for
> Mental Health Partial Hospitalization Treatment services criteria.
> You may request, free of charge, a copy of our rules that govern the
> Optum appeal process and any internal rule, protocol, or guideline relied
> on to decide your appeal. You have the right to receive, free of charge,
> all documents, records or other information relevant to your appeal.
> Some information will be released only upon your written consent.
> Contact Optum at 1-877-447-6002.
>
> The clinical review criteria provided to you are used by this plan to
> authorize, modify, or deny care for persons with similar illnesses or
> conditions. Specific care and treatment may vary depending on individual
> need and the benefits covered under your contract. Please contact the Care
> Advocate listed at the bottom of this letter if you have further questions
> regarding the review criteria.
>
> If your treating practitioner would like to discuss this decision with an Optum
> physician reviewer or other peer reviewer, or wishes to request reconsideration,
> he/she may contact the Care Advocate listed at the bottom of this letter.

(Record 0127). Finally, the letter provided approximately a page of information concerning Fisher's options going forward, including details on how she or her health-care provider could appeal the adverse determination. (*Id.*).

Oliver Pyatt, acting on behalf of Fisher, requested an expedited appeal of Dr. Privette's decision on the afternoon of August 4, 2015. (Def. SUF ¶ 21; Record 0208). The appeal was transferred to HPHC. (Def. SUF ¶ 23; Record 0211).

On August 6, 2015, Dr. Michael I. Bennett reviewed Fisher's file and conducted his own "peer-to-peer" review with Dr. Rivera, Fisher's treating psychologist at Oliver Pyatt. (Def. SUF ¶ 24; Record 0230).

Dr. Bennett reached the same conclusion as Dr. Privette. (Record 0230). After conducting his review, Dr. Bennett noted that the partial hospitalization program was "not medically necessary because there [was] no evidence, given [Fisher's] prior history and our

6

current knowledge of this disorder, that a more intensive, more prolonged intervention [would] do more to improve her self-control or reduce the risk in relapse in someone who is obviously at high risk. Criteria not met include 1.4 and 1.8. Outpatient treatment is necessary." (Record 0230).

On August 7, HPHC sent Fisher a letter informing her that Dr. Bennett had upheld Dr. Privette's decision to deny coverage. (Record 0102-0105). The letter repeated the conclusions Dr. Bennett had included in his notes, and stated:

> [Dr. Bennett's] decision is based on UBH 2015 Level-of-Care Guidelines: Mental Health, as follows. I have included the UBH criteria used to make this decision:
>
> For Partial Hospitalization Programming all of your behavioral health plan's Common Criteria must be met. In this case, Criteria numbers 1.4, 1.8, and 2.1 were not met. Your behavioral health plan's Common Criteria is as follows:
>
> 1.4 The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e. the "why now" factors leading to admission).
>
> 1.8 There is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time.

(Record 0103). The letter then informed Fisher of her options going forward, including the chance to have her appeal reviewed by an independent review organization. (Record 0103). Fisher did not pursue further review and continued to receive treatment through Oliver Pyatt's partial hospitalization program until October 5, 2015. (Def. SUF ¶ 28, 29).

### B. Procedural History

On July 3, 2017, Fisher filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. (ECF 1). She seeks reimbursement for the charges she incurred from attending the partial hospitalization program at Oliver Pyatt between August 1

7

and October 5, 2015. (*Id.*).[4]

HPHC has moved for summary judgment. (ECF 36). Fisher filed a motion for judgment on the same day. (ECF 38).

## II. Standard of Review

In a case involving the denial of ERISA benefits, the district court "sits more as an appellate tribunal than as a trial court. It does not take evidence, but instead evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.,* 315 F.3d 11, 18 (1st Cir. 2002). As a result, in such cases, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'" *Bard v. Boston Shipping Ass'n,* 471 F.3d 229, 235 (1st Cir. 2006) (quoting *Orndorf v. Paul Revere Life Ins. Co.,* 404 F.3d 510, 517 (1st Cir. 2005)).

### A. Whether Deferential or *De Novo* Review Should Be Applied

Ordinarily, a denial of benefits claim under ERISA is reviewed under a *de novo* standard. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). However, if "the employee benefit plan . . . clear[ly] grant[s] discretionary authority to determine eligibility for benefits" to the plan administrator, judicial review is conducted under an "arbitrary and capricious" standard. *Leahy*, 315 F.3d at 15.

The First Circuit has emphasized that any such discretionary authority "must be expressly provided for" to warrant arbitrary and capricious review. *Stephanie C. v. Blue Cross Blue Shield*

---

[4] The complaint asserts two claims. First, Fisher essentially seeks the payment of health insurance benefits she contends she is owed under her plan. Second, she seeks (a) "[r]estitution of all past benefits due . . . plus . . . interest"; (b) "[a] mandatory injunction requiring [HPHC] to immediately qualify [her] for medical benefits due and owing"; and (c) "[s]uch other and further relief as the Court deems necessary and proper to protect the interests of [Fisher]."

8

*of Mass. HMO Blue, Inc.*, 813 F.3d 420, 427 (1st Cir. 2016).  Other circuits have reached similar conclusions; for example, the Seventh Circuit has held that "the critical question" in determining the standard of review "is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case." *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 639-40 (7th Cir. 2005).

Plaintiff contends that defendant's policy does not grant it the requisite discretionary authority and thus that the court should apply *de novo* review.  Defendant, by contrast, contends that the plan "grant[s] HPHC discretion to make determinations regarding the medical necessity of behavioral health benefits," and thus that the court should apply arbitrary and capricious review.[5]

The Court agrees with plaintiff and will apply a *de novo* review standard.  The plan states that HPHC will "use clinical review criteria to evaluate whether certain services or procedures are Medically Necessary for a Member's care."  (Record 0017).  In addition, the plan in part defines "medically necessary" services and procedures as those provided in a manner "consistent with generally accepted standards of medical practice."  (Record 0020).  Thus, that language requires HPHC to "make a judgment within the confines of pre-set standards" rather than

---

[5] In its opposition memorandum, defendant offers no response to plaintiff's argument in support of *de novo* review and instead simply contends that the court should uphold its decision to deny benefits "regardless of the standard of review" that the court "applie[s]." (ECF 39 at 1).  Indeed, even in its own memorandum in support of summary judgment, defendant itself appears to apply a *de novo* standard of review.  Plaintiff appears to contend that defendant's choice to apply *de novo* review should carry the day, because in her view, "defendants have the burden of demonstrating that they are entitled to deferential review." (ECF 37 at 9).  However, as plaintiff also appears to acknowledge, First Circuit precedent requires "inquiring court[s]" to themselves "pursue the plan documents in order to determine the standard of judicial review applicable to a claims administrator's denial of benefits." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 379 (1st Cir. 2015).

9

allowing HPHC to "shape" the content of the rules that are to apply. *Diaz*, 424 F.3d 635.[6] Accordingly, because the Court concludes that the language of the plan does not "clearly grant" discretionary authority to HPHC, it will apply *de novo* review.

## III. Analysis

### 1. Alleged Procedural Defaults

Plaintiff contends that defendant's denial of her benefits claim suffered from three procedural deficiencies.

The ERISA statute requires a plan administrator to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). A Department of Labor regulation issued under the statute "sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. § 2560.503-1(a). The first of those requirements is that "[e]very employee benefit plan shall establish and maintain reasonable procedures governing the . . . notification of benefit determinations." 29 C.F.R. § 2560.503-1(b). Subsection (g) of section 2560.503-1 provides specific requirements concerning the "content" that any benefit determination "notification" must "set forth."

The first procedural dispute, in substance, concerns an ambiguity caused by two of those subsection (g) requirements. Plaintiff relies on subsection (g)(ii), which requires all notifications to "set forth, in a manner calculated to be understood by the claimant, [r]eference to the specific plan provisions on which the [benefit] determination is based." Plaintiff contends that "neither

---

[6] That conclusion aligns with the court's conclusion in *Doe v. Harvard Pilgrim Health Care, Inc.*, where a plan with near-identical language was deemed to warrant *de novo* review. 2017 WL 4540961 at *9 (D. Mass. Oct. 11, 2017) (vacated on different grounds).

10

of the denial letters" sent to her "complied with this requirement."

In response, defendant cites to subsection (g)(v)(B), which applies "[i]n the case of an adverse benefit determination by a group health plan," "[i]f the adverse determination is based on a medical necessity or experimental treatment or similar exclusion or limit." That subsection requires "either an explanation of the scientific clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such an explanation will be provided free of charge upon request." Essentially, defendant contends that the initial denial letter it sent plaintiff did much more than what subsection (g)(v)(B) requires, because it "(1) explain[ed] that the adverse decision was based on a lack of medical necessity; (2) explain[ed] what the reviewer did in the course of her review, including speaking with plaintiff's providers; (3) identif[ied] the level of care guidelines relied upon in the review; and (4) contain[ed] a statement that the claimant may request a copy of the level of care guidelines at no charge." (ECF 39 at 12). Furthermore, defendant contends, the "letter upholding the . . . decision on appeal went one step further" by "citing the specific sections of the level of care guidelines—section 1.4 and 1.8—that had not been satisfied." (*Id.*).

Whether or not defendant is correct that its denial letters satisfied subsection (g)(v)(B), it has not responded to plaintiff's contention that the letters failed to provide "[r]eference to the specific plan provisions on which the determination [was] based," as required by subsection (g)(ii). It provides nothing to suggest that compliance with (g)(v)(B) excuses non-compliance with (g)(ii). And nothing in the regulation suggests that, either; the two subsections appear to be independent requirements for the notifications. Accordingly, the Court concludes that both of the denial letters sent to plaintiff were required to make "[r]eference to the specific plan provisions on which the [benefit] determination is based" under subsection (g)(ii).

While the second letter sent to plaintiff arguably satisfied that requirement, the first letter clearly did not. Instead, the letter provided only that "the applicable medical necessity guidelines" were "reviewed"; that Dr. Privette determined "that medical necessity requirements for [plaintiff's] behavioral health plan's Partial Hospitalization: Mental Health Level of Care Guidelines [were] not met"; and that Dr. Privette's determination "[was] based on the Optum Level of Care Guidelines or Mental Health Partial Hospitalization Treatment Services criteria." (Record 0126-0127). Thus, the first letter makes no reference to *any* "specific plan provision" on which its determination was based. Accordingly, defendant committed a procedural error by failing to comply with 29 C.F.R. § 2560.503-1(g)(ii).

The second procedural dispute concerns plaintiff's contention that defendant provided her with insufficient information as to what she would need to submit to overturn the decision to deny her claim.

Subsection (g)(iii) of 29 C.F.R. § 2560.503-1 provides that all "written . . . notification[s] of any adverse benefit determination" "shall set forth, in a manner calculated to be understood by the claimant" "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."

Here, the first denial letter sent to plaintiff provided that if she disagreed with defendant's decision, she, or "an authorized representative or [her] behavioral health care provider [could] appeal [the] determination." (*Id.*). It also informed plaintiff that she could "request, free of charge, a copy of [UBH's] rules that govern the Optum appeals process and any internal rule, protocol, or guideline relied on to decide [her] appeal" and that she "ha[d] the right to receive, free of charge, all documents, records, or other information relevant to [her] appeal." (*Id.*).

12

Finally, it provided details concerning the appeal, including the time frame in which the appeal would be conducted. (Record 0127-0128).

Plaintiff's contention—that defendant erred by failing to provide her with the information necessary to "overturn" its decision—misapprehends the requirements of subsection (g)(iii). Subsection (g)(iii)'s use of the term "perfect the claim . . . is not 'synonymous with win the appeal.'" *Hatfield v. Blue Cross and Blue Shield of Mass., Inc.*, 162 F. Supp. 3d 24, 41 (quoting *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998)). Indeed, subsection (g)(iii) does not even "impose an obligation to gather additional substantive information." *Id.* Rather, perfecting a claim "refers to comple[ting] a claim—and a complete claim can still be denied." *Id.* In other words, the regulation does not require that an administrator "make any suggestion to [the claimant] as to what type of information might be helpful in appealing [its] determination." *Dickerson v. Prudential Life Ins. Co. of America*, 574 F. Supp. 2d 239, 248 (D. Mass. 2009). Accordingly, defendant's failure to provide plaintiff with the information necessary to overturn its decision was not erroneous.

Third, plaintiff contends that defendant failed to follow the terms of her plan by not "obtain[ing] [her] medical records from Oliver-Pyatt before denying her claim." (ECF 37 at 14). Plaintiff cites to a provision of the plan that describes the appeal process and provides that "[y]our Appeal Coordinator will investigate your appeal and determine if additional information is required. *This information may include medical records*, statements from your doctors, and bills and receipts for services you have received." (Record 0053) (emphasis added).

The provision cited by plaintiff does not require defendant to obtain plaintiff's medical records in every instance; rather, the plan clearly states that defendant *may* determine that medical records are necessary to her appeal. Accordingly—without more—defendant cannot be

13

deemed to have committed a procedural error by electing not to obtain plaintiff's medical records.

### 2. Lack of Prejudice

Defendant contends that even if defendant committed one or more procedural errors, her claim for relief based on these procedural errors must fail because she has failed to show prejudice. Although the contours of the requirement may be less than perfectly defined, the First Circuit has clearly stated that "[a] claimant typically must demonstrate that he or she has been prejudiced as a result of the notice's inadequacy." *Niebauer v. Crane & Co.*, 783 F.3d 914, 927 (1st Cir. 2015) (citing *Bard*, 471 F.3d at 240-41). In *Hatfield*, the district court wrote that "[a] showing of prejudice is required for a remedy because 'ERISA's notice requirements are not meant to create a system of strict liability for formal notice failures." 162 F. Supp. 3d at 42 (quoting *Terry*, 145 F.3d at 39).

"To show prejudice, a claimant need not prove that a different outcome would have resulted had the [administrator] followed the required procedures." *Id.* (quoting *McCarthy v. Commerce Group, Inc.*, 831 F. Supp. 2d 459, 488-89 (D. Mass. 2011)). Rather, "a claimant must show . . . that correct notice 'would have made a difference.'" *Id.* (quoting *Recupero v. New England Tel. and Tel. Co.*, 118 F.3d 820, 840 (1st Cir. 1997)).

Plaintiff has not attempted to show how she was prejudiced by defendant's failure to "refer[] to the specific plan provisions on which [its] determination [was] based" in its initial denial letter. Furthermore, the development of her case after the error suggests that she was not prejudiced. Although defendant's second letter may not have been perfect, it did, in effect, serve to cure the first letter's main defect, by referring to criteria 1.4 and 1.8 of UBH's LOC Guidelines. Plaintiff chose not to have defendant's appellate decision—including the its specific

reliance on criteria 1.4 and 1.8—reviewed by an independent organization, although defendant clearly gave her this option.

Ultimately, therefore, although defendant's failure to "refer[] to the specific plan provisions on which [its] determination [was] based" in its first denial letter technically violated 29 CFR § 2560.503-1(g)(ii), plaintiff has failed to show how *any* prejudice resulted from the error. Accordingly, that error does not warrant a remand.

### 3. **Medically Necessary**

The parties also disagree as to whether defendant correctly concluded that plaintiff's treatment in the Oliver Pyatt partial hospitalization program was not "medically necessary."

An ERISA beneficiary who claims a wrongful denial of benefits bears the burden of demonstrating, by a preponderance of the evidence, that she was in fact entitled to coverage. *Stephanie C.*, 852 F.3d at 112-13.

As set forth above, the plan provides that a service must satisfy five criteria to be deemed "medically necessary." In substance, the services must be (1) consistent with generally accepted standards of medical practice; (2) clinically appropriate in terms of type, frequency, extent, location of service and duration; (3) demonstrated through scientific evidence to be effective in improving health outcomes; (4) representative of best practices in the medical profession; and (5) not primarily for the convenience of the enrollee or physician or other health care provider. (Record 0020).

Plaintiff contends that defendant failed to follow those criteria and "instead used guidelines generated by UBH" to reach its decision. (ECF 37 at 12). It is true that defendant primarily appears to have based its denial on the conclusion that the requested treatment failed to satisfy criteria 1.4 and 1.8 of the UBH guidelines. But, as defendant makes clear, its reviewing

15

doctors used those guidelines to "determine" whether the requested treatment satisfied the second criterion of medical necessity—that the treatment be "clinically appropriate in terms of type, frequency, extent, location of service and duration." Doing so appears to have been entirely appropriate, primarily because the plan itself states that defendant "use[s] clinical review criteria to evaluate whether certain services or procedures are Medically Necessary." (Record 0017). And, as defendant observes, relying on clinical-review criteria to make benefit determinations is a widely accepted practice. *See Jon N. v. Blue Cross Blue Shield of Massachusetts*, 684 F. Supp. 2d 190, 202 (D. Mass. 2010) (finding an administrator's application of its internal criteria to deny coverage to be "appropriate[].").

Apart from contending that defendant followed the wrong criteria in reaching its decision, plaintiff spends much of her memorandum attempting to show that the Oliver Pyatt partial hospitalization program satisfied the plan's five criteria of medical necessity. In particular, she makes various arguments as to why the treatment satisfied the second criterion— that treatment must be "clinically appropriate in terms of type, frequency, extent, location of service and duration"—because she recognizes that it is "the one [criterion] which [defendant] would contend does not apply in this case." (ECF 37 at 17).

Plaintiff barely discusses, however, the specific LOC guidelines—criteria 1.4 and 1.8— that defendant used to determine that plaintiff's treatment at Oliver Pyatt was not "clinically appropriate." Instead, she makes various other contentions as to why her treatment was clinically appropriate.

First, plaintiff offers evidence of the "seriousness" of her condition, including the fact that she had "just been hospitalized due to suicidal thoughts" and was displaying "extreme eating disordered behavior." (ECF 37 at 17). As defendant observes, these descriptions carry little

doctors used those guidelines to "determine" whether the requested treatment satisfied the second criterion of medical necessity—that the treatment be "clinically appropriate in terms of type, frequency, extent, location of service and duration." Doing so appears to have been entirely appropriate, primarily because the plan itself states that defendant "use[s] clinical review criteria to evaluate whether certain services or procedures are Medically Necessary." (Record 0017). And, as defendant observes, relying on clinical-review criteria to make benefit determinations is a widely accepted practice. *See Jon N. v. Blue Cross Blue Shield of Massachusetts*, 684 F. Supp. 2d 190, 202 (D. Mass. 2010) (finding an administrator's application of its internal criteria to deny coverage to be "appropriate[].").

Apart from contending that defendant followed the wrong criteria in reaching its decision, plaintiff spends much of her memorandum attempting to show that the Oliver Pyatt partial hospitalization program satisfied the plan's five criteria of medical necessity. In particular, she makes various arguments as to why the treatment satisfied the second criterion— that treatment must be "clinically appropriate in terms of type, frequency, extent, location of service and duration"—because she recognizes that it is "the one [criterion] which [defendant] would contend does not apply in this case." (ECF 37 at 17).

Plaintiff barely discusses, however, the specific LOC guidelines—criteria 1.4 and 1.8— that defendant used to determine that plaintiff's treatment at Oliver Pyatt was not "clinically appropriate." Instead, she makes various other contentions as to why her treatment was clinically appropriate.

First, plaintiff offers evidence of the "seriousness" of her condition, including the fact that she had "just been hospitalized due to suicidal thoughts" and was displaying "extreme eating disordered behavior." (ECF 37 at 17). As defendant observes, these descriptions carry little

weight, because they describe her condition upon admission to Oliver Pyatt in June 2015, and not in August 2015, when the decision concerning partial hospitalization was actually made. (ECF 39 at 8).

Second, plaintiff contends that, although she made "slow progress" at Oliver Pyatt, her eating order "persisted" through August. (ECF 37 at 17). In particular, she contends that she continued to use "rituals" while eating, such as cutting her food into small bites, and that she continued to rely on Oliver Pyatt staff to plate her food. She also contends that she continued to suffer from "internal symptoms," such as anxiety, depression, and general body-image issues. In response, defendant acknowledges that she continued to experience these symptoms, but contends that neither she, nor her medical providers at Oliver Pyatt, "provide[d] medical evidence as to why" she could not be treated for these issues through an intensive outpatient treatment program. In other words, defendant contends, while plaintiff and her providers may have presented evidence that partial hospitalization would be beneficial, they could not provide evidence that it was medically *necessary*. That assessment appears to be correct. Although plaintiff was obviously still experiencing issues in August, she did not—and still has not—shown why those issues could not have been treated through the "comprehensive outpatient" program defendant offered in lieu of partial hospitalization.

Third, plaintiff points to her Global Assessment of Functioning (GAF) score of 39 as a sign of "impairment" in areas such as reality testing, communication, family relations, judgment, thinking, and mood. (ECF 37 at 18). Essentially, she contends, "[i]t is difficult to imagine that outpatient treatment . . . was appropriate for a person suffering from this type of impairment." (*Id.*). Again, however, defendant notes that the GAF score appears to have been taken upon her

admission to Oliver Pyatt in June, and not at the time of its decision in August.[7]  Ultimately, even if plaintiff is correct that her GAF score suggests that she suffered from serious impairments, she has not provided any authority to support her contention that such a score makes it "difficult to imagine" that outpatient treatment was appropriate at the time.  A mere conclusory statement, without medical evidence, does not suffice to carry her burden.

Fourth, plaintiff suggests that the opinions of her treating doctors at Oliver Pyatt are "especially valuable." (ECF 37 at 19).  In support of that contention, she cites to *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).  In that case, the Supreme Court held that "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." 538 U.S. at 834.  However, because plaintiff has offered nothing to suggest that defendant "arbitrarily refuse[d] to credit" the opinions of her treating physicians, *Black & Decker* is inapposite.  In any event, she is likely correct that the opinions of her treating physicians were "especially valuable" pieces of information in determining whether the requested treatment warranted coverage.  But the record suggests that both Dr. Privette and Dr. Bennett considered those opinions in reaching their decisions; they cannot be deemed to have ignored the opinions of the Oliver Pyatt doctors simply because they ultimately reached a different conclusion.

Finally, in her opposition memorandum, plaintiff at last mentions UBH's LOC guidelines, the criteria upon which the decisions of Dr. Privette and Dr. Bennett largely relied. In particular, she contends that guideline 1.4 "favors [plaintiff] because her condition could not be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care.

---

[7] Defendant cites record page 0095 as support for its contention that plaintiff's GAF score is from June and not August.  Page 0095, however, does not appear to refer to her GAF score at all.  In any event, plaintiff does not appear to dispute that her GAF score was calculated upon her admission to Oliver Pyatt in June.

18

Outpatient treatment would have required [her] to be in charge of her own meals, which Oliver Pyatt specifically informed UBH was not a challenge for which [she] was ready." (ECF 40 at 12). It is not entirely clear from the record what Oliver Pyatt informed UBH about plaintiff's readiness to "be in charge of her own meals." Indeed, in her notes of her interview with the Oliver Pyatt doctors, Dr. Privette states that the doctors told her "that [she] had never had the opportunity to self plate and manage her own food." (Record 0099). But, as Dr. Privette noted, "[t]his [was] simply not true," as she "had done all of that" when she received treatment at Walden. Taking Dr. Privette's comments as additional context, in addition to the fact that she was eating a 2100-calorie diet, and "had not been restricting" her food intake, plaintiff's contention that guideline 1.4 favors her position is not clearly supported by the record. (Record 0098-0099).

Ultimately, although plaintiff has provided evidence that she may have benefitted from the Oliver Pyatt partial hospitalization program, she has not met her burden of demonstrating, by a preponderance of the evidence, that the program was "medically necessary."

    **4.**     <u>**Equitable Relief**</u>

Finally, plaintiff contends that, even if she is not entitled to relief on her first claim for benefits, the Court may still find her second claim for equitable relief to be meritorious. "However, equitable relief under [ERISA] is not appropriate when 'Congress elsewhere provided adequate relief for a beneficiary's injury.'" *Local 369 Utility Workers v. NSTAR Elec. and Gas Corp.*, 317 F. Supp. 2d 69, 72-73 (D. Mass. 2004) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996)). Such is the case here, as "Congress" has "provided [] plaintiff[] with an adequate, alternative form of relief in the form of . . . a cause of action to recover benefits due . . . under the terms of [the] [p]lan." *Id.* at 73.

## IV. Conclusion

For the foregoing reasons, motion of defendant Harvard Pilgrim Health Care of New England, Inc. for summary judgment is GRANTED. The motion of plaintiff Addie Fisher for summary judgment is DENIED.

**So Ordered.**

Dated: May 21, 2019

/s/ F. Dennis Saylor
F. Dennis Saylor, IV
United States District Judge